## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

THI OF NEW MEXICO AT VIDA
ENCANTADA, LLC, THI OF NEW MEXICO, LLC,
FUNDAMENTAL ADMINISTRATIVE
SERVICES, LLC, AND FUNDAMENTAL
CLINICAL CONSULTING, LLC,

       Plaintiffs,

v.                                     Civ. No. 11-634 MV/RHS

MARY LOUISE LOVATO, as Personal
Representative of the Wrongful Death Estate of
Guadalupe Duran, deceased,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiffs' Motion to Compel Arbitration

[Doc. 2] and Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction [Doc. 9].

The Court, having considered the motions, briefs, relevant law and being otherwise fully

informed, finds that Plaintiffs' Motion is well-taken in part and will be GRANTED in part and

denied in part, and that Defendant's Motion is not well-taken and will be DENIED.

## BACKGROUND

On February 6, 2007, Guadalupe Duran executed a statutory power of attorney, ("Power

of Attorney") appointing Mary Ann Atencio and two other individuals as her attorneys-in-fact.

Doc. 4-1, Exhibit C, at 1.  In the Power of Attorney, Ms. Duran initialed a space indicating her

approval of a pre-printed legend that reads:  "If more than one person is appointed to serve as my

attorney-in-fact then they may act severally, alone and independent of each other."  *Id.*  The

Power of Attorney enumerates 17 areas of responsibility as to which Ms. Duran could choose to

confer authority upon her attorneys-in-fact, including "claims and litigation" and "decisions relating to . . . nursing care, medication, hospitalization, [and] institutionalization in a nursing home or other facility and home health care." *Id.* at 2-3.  Ms. Duran initialed the last line, conferring upon her attorneys-in-fact, including Ms. Atencio, "all of the above powers, including financial and health care decisions." *Id.* at 3.  Ms. Duran signed her name below a legend that reads: "I agree that any third party who receives a copy of this power of attorney may act under it." *Id.* at 4.  Finally, the last page of the Power of Attorney contains a legend that reads: "By accepting or acting under the power of attorney, your agent assumes the fiduciary and other legal responsibilities of an agent acting on your behalf." *Id.* at 5.  Ms. Atencio's authority to act as Ms. Duran's attorney-in-fact became effective upon execution of the Power of Attorney. *Id.* at 3-4.

On May 8, 2007, Ms. Duran was admitted to THI of New Mexico at Vida Encantada, LLC ("Vida Encantada") to obtain care.  In connection with her admission, Ms. Atencio, as Ms. Duran's representative, executed a Vida Encantada admission agreement (the "Admission Agreement").  Doc. 4-1, Exhibit A.  The Admission Agreement provides that, as Ms. Duran's representative, Ms. Atencio "will be bound by the applicable terms and conditions of this Agreement." *Id.* at 1.  The Admission Agreement further provides that "Representative will supply [Vida Encantada] with a copy of any power of attorney . . . or other legal documentation permitting him or her to act on Resident's behalf." *Id.* at 10.  Pursuant to this provision, Ms. Atencio provided Vida Encantada with the Power of Attorney.

That same day, Ms. Atencio, as Ms. Duran's personal representative, also signed an arbitration agreement (the "Arbitration Agreement") executed "by and among" Vida Encantada and Ms. Duran.  Doc. 4-1, Exhibit B.  The parties agreed "to bind not only themselves, but also

their successors, assigns, heirs, personal representatives, guardians or any persons deriving their

claims through or on behalf of Resident." *Id.* at 1.  The Arbitration Agreement provides in

relevant part:

> In the event of any controversy or dispute between the parties arising out of or
> relating to Resident's stay at [Vida Encantada], [Vida Encantada's] Admission
> agreement, or breach thereof, or relating to the provision of care or services to
> Resident, including but not limited to any alleged tort, personal injury, negligence
> or other claim; or any federal or state statutory or regulatory claim of any kind; or
> whether or not there has been a violation of any right or rights granted under State
> law (collectively "Disputes"), and the parties are unable to resolve such through
> negotiation, then the parties agree that such Dispute(s) shall be resolved by
> arbitration, as provided by the National Arbitration Forum Code of Procedure or
> other such association.
>
> * * *
>
> The parties agree that only one (1) arbitrator is required to resolve any Dispute(s) and the
> arbitrator shall be selected from a panel having experience and knowledge of the health
> care industry.
>
> * * *
>
> **RESIDENT/REPRESENTATIVE UNDERSTANDS THAT BY SIGNING THIS
> ARBITRATION AGREEMENT, HE/SHE IS WAIVING HIS/HER RIGHT TO
> HAVE CLAIMS, INCLUDING MALPRACTICE CLAIMS, HE/SHE MAY HAVE
> AGAINST THE HEALTH CARE CENTER (INCLUDING ITS AGENTS,
> EMPLOYEES, SERVANTS, PARENTS, SUBSIDIARIES AND AFFILIATES)
> BROUGHT AS A LAWSUIT IN COURT BEFORE A JUDGE OR JURY.**

*Id.* at 1-2 (bold and capitals in original).  In the Arbitration Agreement, Ms. Atencio

acknowledged that she was "not required to use [Vida Encantada] for [Ms. Duran's] healthcare

needs and that there are numerous other health care providers in the State where [Vida

Encantada] is located that are qualified to provide such care."  *Id.* at 1.  Ms. Atencio also

acknowledged that "signing this Agreement to arbitrate is not a precondition for medical

treatment or admission to [Vida Encantada]."  *Id.*  The parties also agreed that the Arbitration

Agreement would be "governed and interpreted under the Federal Arbitration Act." *Id.* Finally, the Arbitration Agreement afforded Ms. Atencio "the right to terminate/revoke this Arbitration Agreement within three (3) business days of execution." *Id.* at 2. Ms. Atencio never revoked her consent to the Arbitration Agreement.

Prior to her admission to Vida Encantada, Ms. Duran had been living at the New Mexico Behavioral Health Center. Doc. 11 at 7. When another resident assaulted her in April 2007, her family began to look for a new place for her to live. *Id.* Many of Ms. Duran's relatives accompanied Ms. Duran on her move from the Behavioral Health Center to Vida Encantada. *Id.* at 8. According to Defendant, Vida Encantada was not ready for Ms. Duran, and she had to wait in the car, and then in the lobby, while her family rushed to fill out the paperwork for her admission. *Id.* Defendant contends that Vida Encantada "had Ms. Atencio sign paperwork, including the arbitration clause at issue here . . . [d]uring this very stressful time." *Id.* Further, Defendant contends that Ms. Atencio was "merely being handed pieces of paper, with Vida Encantada staff pointing to the places where she needed to sign." *Id.* at 9. Defendant also contends that the Arbitration Agreement is "written in very dense, legalistic language," and Ms. Atencio "had no work experience with legal terms or the law." *Id.*

On August 16, 2010, Defendant Mary Louise Lovato, Ms. Duran's granddaughter, in her capacity as a personal representative of Ms. Duran's wrongful death beneficiaries, filed an action in the Fourth Judicial District Court, New Mexico (the "State Court Action"), against, *inter alia*, Plaintiffs herein, alleging wrongful death, negligence, negligent or intentional misrepresentation, violation of New Mexico's Unfair Trade Practices Act, and punitive damages. Defendant alleges that, while a resident of Vida Encantada, Ms. Duran suffered from several unreported and

uninvestigated falls in a short span of time, physical and verbal abuse, pressure ulcers, improper medication administration, and a fall resulting in a hip fracture. *Id.* at 2. Defendant further allege that Ms. Duran died on October 1, 2007, as a result of the poor care and treatment she received at Vida Encantada. *Id.*

On July 18, 2011, Plaintiffs Vida Encantada, THI of New Mexico, LLC ("THI"), Fundamental Administrative Services, LLC ("FAS"), and Fundamental Clinical Consulting, LLC ("FCC"), commenced the instant action under Section 4 of the Federal Arbitration Act ("FAA"), basing federal jurisdiction on the diversity of citizenship between Plaintiffs, all Delaware limited liability companies, and Defendant, alleged to be a New Mexico citizen. *See* Doc. 1. In their Complaint and in their Motion to Compel Arbitration, Plaintiffs seek an order compelling Defendant to arbitrate the claims she asserted against Plaintiffs in the State Court Action and staying this case and the State Court Action pending arbitration. *See* Docs. 1 and 2.

On August 1, 2011, Defendant filed a Motion to Dismiss the instant action. *See* Doc. 9. In the alternative, Defendant asks this Court to abstain under the doctrine set forth in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976). On the same day, Defendant also filed an opposition to Plaintiffs' motion, arguing that the Arbitration Agreement is invalid and unenforceable.

## DISCUSSION

I.    Defendant's Motion to Dismiss

Defendant moves to dismiss on two grounds. First, Defendant argues that federal jurisdiction is lacking, as there is not complete diversity of citizenship between the parties. In the alternative, Defendant argues that the *Colorado River* abstention doctrine applies.

A.     Jurisdiction

The FAA provides that a written agreement requiring arbitration of controversies arising

out of "a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable,

and enforceable, save upon such grounds as exist at law or in equity for the revocation of any

contract." 9 U.S.C. § 2.  Section 2 creates "a substantive rule applicable in state as well as

federal courts."  *Southland Corp. v. Keating*, 465 U.S. 1, 16 (1984).  Section 4, however,

contains only a limited grant of federal court jurisdiction, permitting a party to seek an order

compelling arbitration in "any United States district court which, save for [the arbitration]

agreement, would have jurisdiction under Title 28 . . . of the subject matter of a suit arising out

of the controversy between the parties."  9 U.S.C. § 4.  Thus, the FAA "bestow[s] no federal

jurisdiction but rather requir[es] an independent jurisdictional basis."  *Hall St. Assocs., L.L.C. v.

Mattel, Inc.*, 552 U.S. 576, 582 (2008) (citation omitted).  Here, the independent jurisdictional

basis alleged by Plaintiffs is diversity of citizenship under 28 U.S.C. § 1332(a).

Diversity jurisdiction requires complete diversity of citizenship between the parties and

an amount in controversy exceeding $75,000.  *Id.*  Defendant does not dispute that the amount in

controversy is met, but contends that complete diversity is lacking for two reasons.

First, Defendant argues that Plaintiffs "self-selected certain parties to compel

arbitration," thus leaving out a non-diverse, "essential" party, namely, William Chaltry, the

administrator of Vida Encantada, who is a New Mexico resident.  Doc. 9 at 3.  According to

Defendant, the Court should "look through" the Complaint as to whether jurisdiction would have

existed in the state court controversy.  *Id.*  Although Defendant cites no authority for this

proposition, it appears that Defendant is relying on *Vaden v. Discover Bank*, in which the

Supreme Court held that a federal court entertaining a petition to compel arbitration based upon *federal question* jurisdiction "should determine its jurisdiction by 'looking through' a § 4 petition to the parties' underlying substantive controversy." 556 U.S. 49, 60 (2009). *Vaden*, however, is inapplicable here, where jurisdiction is founded on diversity of citizenship between the parties, rather than on the presence of a federal question. *Northport Health Servs. of Arkansas, LLC v. Rutherford*, 605 F.3d 483, 488-91 (8th Cir. 2010). In the context of cases involving diversity of citizenship, "circuit decisions [have been] unanimous in looking only to the citizenship of the parties to the federal action." *Id.* at 489. Further, "[a] traditional principle of diversity jurisdiction is that it cannot be defeated by a non-diverse joint tortfeasor who is not a party to the federal action, unless that party is indispensable under Rule 19." *Id.* at 490-91 (citing *Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990)). In the context of a federal action to compel arbitration, "every circuit to consider the issue has concluded that a party joined in a parallel state court contract or tort action who would destroy diversity jurisdiction is not an indispensable party under Rule 19." *Id.* at 491. Accordingly, Mr. Chaltry, a non-diverse party in the State Court Action, is not an indispensable party to this action to compel arbitration and thus cannot defeat diversity jurisdiction.

Defendant next asserts that under the "corporation model of citizenship," Vida Encantada and THI are New Mexico citizens, and thus are non-diverse parties. Doc. 9 at 4. Plaintiffs, however, are not corporations, but rather Delaware limited liability companies. *See* Doc. 17-1. As limited liability companies, Plaintiffs are citizens of all States of which their respective members are citizens. *See Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006) ("We therefore join our sister circuits and hold that, like a partnership, an LLC is a

citizen of every state of which its owners/members are citizens."); *Pramco, LLC v. San Juan Bay Marina, Inc.*, 435 F.3d 51, 54-55 (1st Cir. 2006) ("Limited liability companies are unincorporated entities. . . . Every circuit to consider this issue has held that citizenship of a limited liability company is determined by the citizenship of all of its members."); *THI of New Mexico at Las Cruces, LLC v. Fox*, 727 F. Supp. 2d 1195 (D.N.M. 2010) (finding diversity jurisdiction where plaintiff was a limited liability company whose sole member was a citizen of Delaware and Maryland, and defendants were New Mexico citizens).

Plaintiff Vida Encantada's sole member is Plaintiff THI, which has a single member, THI of Baltimore, Inc., a Delaware corporation with its principal place of business in Maryland. Doc. 1, ¶ 1. Plaintiff FCC's sole member is also THI of Baltimore, Inc. *Id.* Plaintiff FAS's sole member is Fundamental Long-Term Care Holdings, LLC, which is a Delaware limited liability company with two members, real persons who are citizens of New York and New Jersey. *Id.* at ¶ 2. Accordingly, for purposes of federal diversity jurisdiction, Plaintiffs Vida Encantada, THI and FCC are citizens of Delaware and Maryland, and Plaintiff FAS is a citizen of New York and New Jersey. *Id.* at ¶¶ 1-2. As Defendant is a citizen of New Mexico, *id.* at ¶ 3, there is complete diversity among the parties.

B.   Abstention

In *Colorado River*, the Supreme Court announced an abstention doctrine under which a federal court, for reasons of "wise judicial administration," may stay or dismiss a federal suit pending resolution of a parallel state court proceeding. 424 U.S. at 817. Because the federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them," the *Colorado River* doctrine may be used only when "the clearest of justifications . . . warrrant[s]

dismissal." *Id.* at 818-19.  Declining to exercise jurisdiction based on the *Colorado River* doctrine is appropriate only in "exceptional" circumstances.  *Id.* at 818.  Accordingly, this Court's "task . . . is not to find some substantial reason for the exercise of federal jurisdiction by the federal court; rather, the task is to ascertain whether there exist exceptional circumstances, the clearest of justifications, that can suffice under *Colorado River* to justify the surrender of the jurisdiction."  *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25-26 (1983).

As a threshold issue, the Court first must determine whether the state and federal proceedings at issue are indeed parallel.  *Fox v. Mauling*, 16 F.3d 1079, 1081 (10th Cir. 1994).  "Suits are parallel if substantially the same parties litigate substantially the same issues in different forums."  *Id.*  The Tenth Circuit has specifically held that, in order to determine whether pending state proceedings are parallel to the federal proceedings, the Court must "examine the state proceedings *as they actually exist*."  *Id.* (emphasis in original).

If the Court finds that the state and federal proceedings are parallel, "it must then determine whether deference to state court proceedings is appropriate under the particular circumstances."  *Id.* at 1082.  In *Colorado River*, the Supreme Court enumerated a nonexclusive list of factors to consider in deciding whether "exceptional circumstances" exist to warrant such deference: (1) whether either court has assumed jurisdiction over property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; and (4) the order in which the courts obtained jurisdiction.  *Id.* (citing *Colorado River*, 424 U.S. at 818).  The Supreme Court discussed other factors in *Moses H. Cone*, including whether federal law provides the rule of decision, and the adequacy of the state court action to protect the federal plaintiff's rights.  *Fox*, 16 F.3d at 1082 (citing *Moses H. Cone*, 460 U.S. at 18 n.20, 23, 28).

Other courts have considered whether the party opposing abstention has engaged in impermissible forum-shopping. *Fox*, 16 F.3d at 1082.

The Supreme Court has counseled that no single factor is dispositive, but rather, "[t]he weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case." *Moses H. Cone*, 460 U.S. at 16. The Court is cautioned against using the factors as a "mechanical checklist," and instead must engage in "a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." *Id.* Finally, the Court must resolve any doubt "in favor of exercising federal jurisdiction." *Fox*, 16 F.3d at 1802.

Here, Defendant argues that the State Court Action is parallel to the instant case, and that an analysis of the *Colorado River* factors demonstrates exceptional circumstances warranting dismissal. The Court disagrees with both arguments.

First, although Defendant is correct that the State Court Action includes substantially the same parties as those herein, the issues in each action are not "substantially identical." Doc. 9 at 6. Defendant admits that the sole issue raised by Plaintiffs' Complaint herein is the enforceability of the Arbitration Agreement, and that Plaintiffs have not raised this issue in the State Court Action. *Id.* at 6-7. Nonetheless, Defendant contends that, because the Arbitration Agreement relates to the claims asserted in the State Court Action, and because Plaintiffs *may* raise the arbitration issue in the State Court Action, the two proceedings are parallel. *Id.* This argument ignores the Tenth Circuit's mandate that this Court examine the state proceedings *as they actually exist*, rather than as they might exist if the parties had elected to raise certain issues before the State Court. Because the enforceability of the Arbitration Agreement, the only issue

-10-

before this Court, is not *actually* an issue before the State Court, the issues in this case and the State Court Action are not substantially the same.  *See Brown v. Pac. Life Ins. Co.*, 462 F.3d 284, 395 n.7 (5th Cir. 2006) (noting that a federal action to compel arbitration was not "precisely parallel" to the state court action but declining to decide the issue); *R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n, Inc.*, 3 F. App'x 43, 45 (4th Cir. 2001) (where state case involved negligence claim and federal case sought order compelling arbitration, holding that "[t]he state proceedings . . . fail to reach [the] 'totally duplicative' threshold because they do not raise the same issues or seek the same remedies [as the motion to compel arbitration].").

The decision in *THI of New Mexico at Las Cruces, LLC v. Fox*, 727 F. Supp. 2d 1195 (D.N.M. 2010), does not suggest a different conclusion.  In *Fox*, plaintiff nursing home had moved to compel arbitration in state court, and the state court entered an order compelling arbitration and dismissing the case.  Subsequently, the nursing home moved to reinstate the state court action.  While that motion was pending, the nursing home also moved to compel arbitration in federal court.  On the defendant's motion to dismiss the federal court action under the *Colorado River* doctrine, the Court found that the state court and federal court proceedings were parallel, as they involved identical parties "and the identical issue of whether the Arbitration Agreement is enforceable."  *Id.* at 1209.  Unlike the circumstances in *Fox*, Plaintiffs herein did not move to compel arbitration in the State Court Action, and thus the enforceability of the Arbitration Agreement is not before the State Court.  Accordingly, *Fox* is distinguishable from the instant case, and provides no support for Defendant's argument that the proceedings are parellel.

Even if the proceedings were parallel, consideration of the *Colorado River* factors demonstrates that abstention is not warranted.  Because there was no assumption by either the State Court or this Court of jurisdiction over any res or property, nor any contention by Defendant that this forum is any less convenient to the parties than the state forum, the first two factors favor federal jurisdiction.  *Moses H. Cone*, 460 U.S. at 939; *Fox*, 727 F. Supp. 2d at 1209.

The third factor, avoidance of piecemeal litigation, provides little support for declining to exercise federal jurisdiction.  In *Moses H. Cone*, the Supreme Court considered and rejected the same argument made by Defendant herein that an arbitration order in federal court would force the parties to resolve related disputes in different forums.  The Supreme Court explained that this "misfortune, however, is not the result of any choice between the federal and state courts; it occurs because the relevant federal law *requires* piecemeal resolution when necessary to give effect to an arbitration agreement."  460 U.S. at 20 (emphasis in original).  Under the FAA, "an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement." *Id.*  This is true regardless of whether this Court or the State Court decides the question of the enforceability of the Arbitration Agreement.  *See id.*  Although Defendant may be required to "litigate the arbitrability issue in federal rather than state court, that dispute is easily severable from the merits of the underlying disputes."  *Id.* at 20-21.  Accordingly, "there is no force here to the consideration that was paramount in *Colorado River* itself – the danger of piecemeal litigation." *Id.* at 19.

The fourth factor, the order in which the courts obtained jurisdiction, also weighs against abstention.  By necessity, an action to compel arbitration must follow a refusal by the other party to arbitrate.  Accordingly, Plaintiffs could not have moved to compel arbitration until Defendant first filed her claims against Plaintiffs, and then refused to arbitrate them.  Further, this factor "is to be applied in a pragmatic, flexible manner with a view to the realities of the case at hand."  *Id.* at 21.  Accordingly, "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions."  *Id.*  Here, although Defendant commenced the State Court Action on August 16, 2010, virtually nothing happened until she filed her Amended Complaint in March 2011.  Plaintiffs commenced the instant action three months later, promptly upon discovery of the Arbitration Agreement.  *See* Doc. 16 at 11.  At the same time, Plaintiffs moved for a stay in State Court pending this Court's decision on the arbitration issue.  *Id.* at 11-12.  As a result, the State Court postponed hearing a motion to dismiss and jurisdictional motions filed by defendants therein.  *Id.* at 12.  Indeed, in terms of the arbitrability issue, no progress has been made in State Court, as the issue has not been raised there, while Plaintiffs have taken all of the steps necessary to a resolution of that issue in this Court.  Accordingly, in terms of the sole issue before this Court, the federal suit is "running well ahead of the state suit."  *Id.* at 22.

Consideration of the additional factor of whether federal law provides the rule of decision is less clear.  As in *Moses H. Cone*, the basic issue presented in Plaintiffs' federal suit is "the arbitrability of the dispute" between Plaintiffs and Defendant.  *Id.* at 24.  "Federal law in terms of the Arbitration Act governs that issue in either state or federal court."  *Id.*  Because, however, the federal courts' jurisdiction to enforce the FAA is concurrent with that of state courts, "the

-13-

source-of-law factor has less significance." *Id.* at 25.  At the same time, at least some of

Defendant's arguments against enforceability of the Arbitration Agreement, namely that it is

unconscionable and does not bind Defendant or certain Plaintiffs, are governed by New Mexico

law.  *See Fox*, 727 F. Supp. 2d at 1209; *THI of New Mexico at Hobbs Center, LLC v. Patton*,

Civ. No. 11-537 (LH/CG), 2012 WL 112216, *5-6 (D.N.M. Jan. 3, 2012).  The Supreme Court,

however, has indicated that "[a]lthough in some rare circumstances the presence of state-law

issues may weigh in favor of [the surrender of federal jurisdiction], "the presence of federal-law

issues must always be a major consideration weighing against surrender." *Moses H. Cone*, 460

U.S. at 26.  Accordingly, on balance, this factor weighs slightly against abstention.

The additional factor of the adequacy of the state court action to protect the federal

plaintiff's rights "presents the strongest basis for abstaining." *PaineWebber, Inc. v. Cohen*, 276

F.3d 197, 208 (6th Cir. 2002).  "The FAA extends Congress's legislative authority to the

maximum extent permitted under the Commerce Clause, and is therefore binding on state courts

that interpret contracts involving interstate commerce." *Id.*  Accordingly, Plaintiffs' rights under

the FAA would thus be protected in the State Court Action.  *Id.*

Finally, the additional factor of whether the party opposing abstention has engaged in

impermissible forum-shopping once again points toward exercising federal jurisdiction.

Defendant argues that Plaintiffs' filing of the instant action was an impermissible attempt to

avoid a state court decision on the enforceability of the Arbitration Agreement.  This argument

fails to recognize that the FAA specifically provides that any party to an arbitration agreement

may file an action in federal court to compel arbitration.  *Id.* at 203-04.  The act of filing an

action to compel arbitration in federal court in compliance with the FAA, alone, provides no

evidence of improper forum-shopping.  Indeed, Defendant's argument that the State Court
Action would have provided an adequate forum to protect Plaintiffs' rights undercuts their claim
that Plaintiffs' goal in commencing the instant action was to avoid litigation of the arbitration
issue in state court, rather than to make proper use of the judicial process at their disposal under
the FAA.  Further, Defendant's argument "presents only one side of an argument that both
parties can make:" just as Defendant accuses Plaintiffs of forum-shopping, it is possible to view
Defendant's naming of Mr. Chaltry, a New Mexico resident, in the State Court Action as a
strategy solely designed to preclude removal of the State Action to federal court.  *Id.*
Defendant's forum-shopping accusation thus "ignores what may have motivated [her] own
actions."  *Id.*  Moreover, unlike the circumstances in *Fox*, where the Court found that the nursing
home filed "an identical motion to compel arbitration in [federal] court during the pendency of
the motion to reinstate the State Court Action," here, Plaintiffs filed no such motion to compel
arbitration in the State Court Action.  727 F. Supp. 2d at 1213.  Accordingly, the *Fox* Court's
conclusion that the nursing home filed the duplicative motion "[o]ut of fear that the state court's
order compelling arbitration will be vacated upon reconsideration" is inapplicable here, where
there is no similar duplicative motion, no similar fear of reversal of a previous order, and thus no
basis to conclude that Plaintiffs sought to compel arbitration in this Court for a "vexatious,
reactive or tactical reason."  *Id*.

The above analysis demonstrates that all of the factors, save the adequacy of the state
court proceeding to protect the federal plaintiff's rights, weigh against abstention.  Accordingly,
no "exceptional" circumstances exist to justify abandoning the "virtually unflagging obligation
of the federal courts to exercise the jurisdiction given them." *Colorado River*, 424 U.S. at 817.

The Court thus concludes that it should not abstain from exercising jurisdiction over Plaintiffs' action to compel arbitration.

II.     Plaintiffs' Motion to Compel Arbitration

      Based on the Arbitration Agreement signed by Ms. Atencio as Ms. Duran's representative, Plaintiffs seek an order compelling Defendant to arbitrate the claims she asserted against them in the State Court Action.  Defendant opposes Plaintiffs' motion.

      A.     Legal Standard

      The FAA provides that a written agreement requiring arbitration of controversies arising out of "a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  Under Section 4 of the FAA, a "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  In enacting the FAA, "Congress intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements."  *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987).  There is a "clear federal policy of requiring arbitration unless the agreement to arbitrate is not part of a contract evidencing interstate commerce or is revocable 'upon such grounds as exist at law or in equity for the revocation of any contract.'" *Id.* (quoting 9 U.S.C. § 2).   Further, the Supreme Court has emphasized "the fundamental principle that arbitration is a matter of contract," and that "courts must place arbitration agreements on an equal footing with other contracts . . . and enforce them according to their terms."  *AT&T Mobility LLC v. Conception*, 131 S. Ct. 1740, 1745 (2011).

-16-

The FAA, however, "was not enacted to force parties to arbitrate in the absence of an agreement." *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1286 (10th Cir. 1997). Congress' concern, rather, 'was to enforce private agreements into which parties had entered." *Id.* Accordingly, "[t]he existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." *Id.* at 1287. The Court "look[s] to state law principles of contract formation to tell us whether an agreement to arbitrate has been reached." *Id.* It is the party seeking judicial enforcement of an arbitration agreement who "bears the burden of persuasion." *Patton*, 2012 WL 112216, at * 6 (citation omitted).

B.    The Instant Case

Under Section 4 of the FAA, Plaintiffs move to compel Defendant to arbitrate her claims against them. In support of their motion, Plaintiffs argue that the Arbitration Agreement is valid and enforceable, and that Defendant's claims fall within the substantive scope of the Arbitration Agreement. Doc. 2 at 7. Defendant does not contest that her claims are within the scope of the Arbitration Agreement, but opposes Plaintiffs' motion on the basis that no valid agreement to arbitrate exists. Specifically, Defendant argues that the Arbitration Agreement is unenforceable because: (1) the arbitrator designated by the parties is unavailable; (2) the Arbitration Agreement is procedurally unconscionable; and (3) the Arbitration Agreement does not bind Defendant as the representative of Ms. Duran's estate, Ms. Duran herself, or any of the Plaintiffs other than Vida Encantada. In addition, Defendant argues that, even if the Arbitration Agreement were enforceable, Plaintiffs have nonetheless waived their right to compel arbitration.

1.    <u>Unavailability of Designated Arbitrator</u>

The Arbitration Agreement provides that disputes between the parties, as defined therein, "shall be resolved by arbitration, as provided by the National Arbitration Forum Code of Procedure or other such association."  Doc. 4-1 at 1.  The Arbitration Agreement further provides that only one arbitrator is required to resolve any dispute between the parties, and that "the arbitrator shall be selected from a panel having experience and knowledge of the health care industry."  *Id.*  Sometime after execution of the Arbitration Agreement, the National Arbitration Forum ("NAF") discontinued the administration of consumer arbitrations.  Relying on *Rivera v. Am. Gen. Fin. Servs., Inc.*, 259 P.3d 803 (N.M. 2011), Defendant argues that the NAF is integral to the Arbitration Agreement, and that its unavailability renders the Arbitration Agreement unenforceable.  Doc. 11 at 4-6.  The Court's reading of *Rivera* leads to the opposite conclusion.

In *Rivera*, the New Mexico Supreme Court held that, in order to determine whether an arbitration agreement is unenforceable because of its designation of an arbitration provider who is no longer available, the Court must determine whether the parties' designation of a particular arbitration provider is "integral to the parties' agreement to arbitrate," or whether instead "the parties' designation of a provider is merely an 'ancillary logistical concern.'" 259 P.3d at 811-12.  This determination is "a matter of contract interpretation."  *Id.* at 812.  Accordingly, "where the arbitration provisions do not specifically designate a provider or where a provision gives transacting parties a choice of providers," the identity of the arbitration provider is an ancillary logistical concern.  *Id.* at 813.  "On the other hand, an arbitration agreement's express designation of a single arbitration provider weighs in favor of a finding that the designated

provider is integral to the agreement to arbitrate." *Id.* "Mandatory, as opposed to permissive, contractual language further demonstrates that a specifically named arbitration provider is integral to the agreement to arbitrate." *Id.* In the case before it, the Court found that the parties intended for the NAF to be the exclusive arbitrator in any out-of-court dispute resolution, because the arbitration agreement named the NAF exclusively throughout its provisions, and mandated that "[a]rbitration will be conducted under the rules and procedures of the [NAF]." *Id.* at 814. On that basis, the Court held that arbitration before the NAF was integral to the agreement to arbitrate, and that the unavailability of the NAF rendered the arbitration agreement unenforceable. *Id.* at 815.

In contrast to the agreement in *Rivera*, the Arbitration Agreement here neither expressly designates the NAF as the single arbitration provider, nor binds the parties to follow the rules and procedures of the NAF. Rather, the Arbitration Agreement leaves it to the parties to choose an arbitrator who "shall be selected from a panel having experience and knowledge of the health care industry," and allows for arbitration "as provided by the [NAF] Code of Procedure *or other such association*. Doc. 4-1 at 1 (emphasis added). The Arbitration Agreement thus expressly permits use of an arbitration provider other than the NAF and application of the rules and procedures of an association other than the NAF. For this reason, as a matter of contract interpretation, arbitration before the NAF is not integral to the Arbitration Agreement, but rather is merely an ancillary logistical concern. Accordingly, under *Rivera*, the unavailability of the NAF does not render the Arbitration Agreement unenforceable.

2.     Unconscionability

Defendant argues that the Arbitration Agreement is unenforceable because it is unconscionable.  "Unconscionability is an equitable doctrine, rooted in public policy, which allows courts to render unenforceable an agreement that is unreasonably favorable to one party while precluding a meaningful choice of the other party."  *Rivera*, 259 P.3d at 816 (citation omitted).  "The doctrine of contractual unconscionability can be analyzed from both procedural and substantive perspectives."  *Id.* at 816-17 (citation omitted).  "Procedural unconscionability concerns "the particular factual circumstances surrounding the formation of the contract, including the relative bargaining strength, sophistication of the parties, and the extent to which either party felt free to accept or decline terms demanded by the other."  *Id.* at 817.  When determining whether a contract is procedurally unconscionable, the Court should consider whether the contract is one of adhesion:  "a standardized contract offered by a transacting party with superior bargaining strength to a weaker party on a take-it-or-leave-it basis, without opportunity for bargaining."  *Id.* (citation omitted).  An adhesion contract is not unconscionable, however, unless its "terms are patently unfair to the weaker party."  *Id.*

Here, Defendant argues that the Arbitration Agreement is procedurally unconscionable because it is an adhesion contract that was offered to Ms. Atencio on a "take it or leave it" basis when she "was in a greatly diminished bargaining position and did not feel free to accept or decline the terms demanded by Plaintiffs."[1]  Doc. 11 at 7.  Specifically, Defendant claims that

---

[1] Although Defendant's opposition sets forth the legal standard for substantive unconscionability as well as procedural unconscionability, she proceeds to argue only that the Arbitration Agreement is procedurally unconscionable.  Because Defendant thus appears to concede that the Arbitration Agreement is not substantively unconscionable, the Court need not

when Ms. Duran and her family arrived at Vida Encantada, the facility was not ready for Ms. Duran, and she had to wait in the car, and then in the lobby, while her family rushed to fill out the paperwork for her admission.  *Id.*  Defendant contends that Vida Encantada "had Ms. Atencio sign paperwork, including the arbitration clause at issue here . . . [d]uring this very stressful time."  *Id.*  Further, Defendant contends that Ms. Atencio was "merely being handed pieces of paper, with Vida Encantada staff pointing to the places where she needed to sign."  *Id.* at 9.  Defendant also contends that the Arbitration Agreement is "written in very dense, legalistic language," and that Ms. Atencio "had no work experience with legal terms or the law."  *Id.*

On the other hand, however, Defendant admits that Ms. Atencio did not have to go through the process of admitting her mother to the nursing home alone.  Rather, she had the support and assistance of many of Ms. Duran's relatives.  *Id.* at 8.  Additionally, rather than being faced with the ordeal of having to find a facility on an emergency basis, the family had been looking for a place for Ms. Duran to live for at least one month prior to her admission to Vida Encantada.  *Id.* at 7.

The Court finds that, while the circumstances surrounding Ms. Atencio's execution of the Arbitration Agreement reflect the inherently stressful nature of admitting a loved one into a nursing home, they do not establish procedural unconscionability.  The law is clear that "[e]ach party to a contract . . . has a duty to read and familiarize herself with its contents before signing it, and thus, a party who executes and enters a written contract is presumed to know the terms of the agreement and to have agreed to each of its provisions in the absence of fraud,

---

address this issue.

misrepresentation, or some other wrongful act." *Patton*, 2012 WL 112216, at * 22 (citing *Smith v. Price's Creameries*, 650 P.2d 825, 829 (N.M. 1982)).  Contrary to Defendant's description, the terms of the Arbitration Agreement  -- which is only two pages long – "are straightforward and clear enough that an unsophisticated lay person could understand [them]." *Patton*, 2012 WL 112216, at *22 (interpreting analogous arbitration agreement).  At the top of the first page, the Arbitration Agreement directs in bold, capital letters, "please read carefully."  Doc 4-1, Exhibit B, at 1.  The Arbitration Agreement also explains in bold, capital letters that, by Ms. Atencio's signature, Ms. Duran waived her right to have any claims against Vida Encantada brought as a lawsuit in court before a judge or jury.  *Id.* at 2.  Defendant has presented no evidence that Ms. Atencio ever told anyone at Vida Encantada that she did not understand the Arbitration Agreement, that she ever asked for clarification of its terms, or that Vida Encantada staff acted wrongfully in securing her signature.  Defendant's assertions that Ms. Atencio signed the Arbitration Agreement during a stressful time, and that the staff at Vida Encantada did nothing but point out to her where to sign, fall short of showing that Ms. Atencio "was of such diminished capacity or intelligence that she was incapable of understanding the Arbitration Agreement or that [Vida Encantada] used fraud or misrepresentation, or otherwise acted wrongfully." *Patton*, 2012 WL 112216, at *22.

Moreover, Ms. Atencio's "mere subjective feeling of not being free to decline arbitration terms [is not] enough to demonstrate procedural unconscionability."  *Id.*  A contract is procedurally unconscionable "only where the inequality is so gross that one party's choice is effectively non-existent." *Guthmann v. LaVida Llena*, 709 P.2d 675, 679 (N.M. 1985).  "Factors

to be considered include the use of sharp practices or high pressure tactics and the relative

education, sophistication or wealth of the parties, as well as the relative scarcity of the subject

matter of the contract."  *Id.*  Defendant has not shown that any of these factors were at work

here.

      First, the Arbitration Agreement expressly states that it is purely voluntary:

"Resident/Representative understands that signing this Agreement to arbitrate is not a

precondition for medical treatment or admission to [Vida Encantada]."  Doc. 4-1, Exhibit B, at 1.

Accordingly, while the Arbitration Agreement may be a standardized contract, Vida Encantada

did not present it to Ms. Atencio on a "take it or leave it" basis.  Further, the Arbitration

Agreement afforded Ms. Atencio three days to revoke the agreement for any reason or no reason

at all, *id.* at 2, thus relieving any pressure she may have felt by signing it during a stressful time

or without the counsel of an attorney.  Defendant has presented no evidence that Vida Encantada

staff implied in any way that, contrary to its terms, either the voluntary nature or the revocability

of the Arbitration Agreement were illusory, or otherwise used "sharp practices or high pressure

tactics" in securing Ms. Atencio's signature.  Finally, Ms. Atencio expressly acknowledged that

"she [was] not required to use [Vida Encantada] for [Ms. Duran's] healthcare needs, and that

there are numerous other health care providers in the State that are qualified to provide such

care," *id.* at 1, thus dispelling the idea that the relative scarcity of the subject matter of the

contract made her choice "effectively non-existent."  For these reasons, the Arbitration

Agreement is not unenforceable on the basis of procedural unconscionability.

3. <u>Parties Bound by the Arbitration Agreement</u>

Invoking the principle that "generally, third parties who are not signatories to an arbitration agreement are not bound by the agreement and are not subject to, and cannot compel, arbitration," *Horanburg v. Felter*, 99 P.3d 685, 689 (N.M. Ct. App. 2004), Defendant argues that neither Ms. Duran nor Defendant, as the representative of Ms. Duran's estate, can be compelled to arbitrate under the Arbitration Agreement, and that Plaintiffs THI, FAS, and FCC cannot compel arbitration under the Arbitration Agreement. Doc. 11 at 13-16. The issue of whether a non-signatory can be bound by, or compel arbitration under, an arbitration agreement is governed by state law. *See Arthur Anderson LLP v. Carlisle*, 129 S. Ct. 1896, 1902 (2009).

A. <u>Ms. Duran</u>

In their moving brief, Plaintiffs establish that, under the Power of Attorney, which conferred unrestricted authority upon Ms. Atencio to act as Ms. Duran's agent, Ms. Atencio had both actual and apparent authority to bind Ms. Duran to the Arbitration Agreement. Doc. 3 at 9-15. In her response, Defendant does not refute that Ms. Atencio had authority to bind Ms. Duran to the Arbitration Agreement, and therefore she is deemed to concede this point. Nonetheless, Defendant argues that Ms. Duran was not bound by the Arbitration Agreement because she was not a third-party beneficiary of that contract. Doc. 11 at 18-19.

As an initial matter, it is irrelevant whether Ms. Duran was a third-party beneficiary. Ms. Atencio's actual and apparent authority to act on behalf of Ms. Duran was sufficient to bind Ms. Duran to the Arbitration Agreement. *See Barron v. Evangelical Lutheran Good Samaritan Soc.*, 265 P.3d 720, 725-32 (N.M. Ct. App. 2011). In any event, Defendant is incorrect that Ms. Duran

was not a third-party beneficiary of the Arbitration Agreement.  Under New Mexico law,

although not herself a signatory to a contract, a third-party beneificiary of a contract may be

bound by, or seek to enforce, that contract.  *Fleet Mort. Corp. v. Schuster*, 811 P.2d 81, 82 (N.M.

1991).  "Whether a party is a third-party beneficiary depends on if the parties to the contract

intended to benefit the third party."  *Id.* at 83.  "Such intent must appear either from the contract

itself or from some evidence that the [third party] is an intended beneficiary."  *Id.*  The third-

party beneficiary doctrine applies to arbitration contracts.  *See Rivera v. Am. Gen. Fin. Servs.,

Inc.*, 242 P.3d 351, 358, (compelling arbitration pursuant to third-party beneficiary doctrine),

*rev'd on other grounds*, 259 P.3d 803.  Further, "a number of courts in other jurisdictions have

used the third-party beneficiary doctrine to compel a non-signatory to arbitrate in circumstances

similar to those here."  *Patton*, 2012 WL 112216, at *8 (collecting cases).  "This Court

concludes that the New Mexico Supreme Court would likely follow the reasoning of [those

cases] extending the third-party beneficiary doctrine to the situation at hand."  *Id.*

Here, the undisputed facts establish that Ms. Duran was a third-party beneficiary of both

the Admission Agreement and the Arbitration Agreement contained therein,[2] based on the clear

terms of the agreements.  She was the named resident to be admitted to the facility, and the terms

of the Admission Agreement refer to benefits and responsibilities of the resident.  Doc. 4-1, Ex.

A.  Ms. Duran's care was the essential purpose of the agreements.  *Id.* at 2; Doc. 4-1, Ex. B.

---

[2]  Because Ms. Atencio signed the Arbitration Agreement and the Admission Agreement on the same day as part of the same admissions process, the two documents comprise a single contract.  *See Crow v. Capitol Bankers Life Ins. Co.*, 891 P.2d 1206, 1210 (N.M. 1995) ("If two or more writings are part of a single transaction and concern the same subject matter, then they are a single contract.").

Indeed, Ms. Lovato's Affidavit confirms that the motivating cause for entering the Admission Agreement was to benefit Ms. Duran.  *See* Doc. 11-1.

Defendant's argument that Ms. Duran claimed no benefit as a result of Ms. Atencio's execution of the Arbitration Agreement is unavailing.  The New Mexico Court of Appeals has specifically found that "there are advantages to arbitration which, among other benefits, are that it generally costs less than litigation and leads to a quicker resolution."  *Barron*, 265 P.3d at 732. Indeed, given the fact that the Arbitration Agreement was optional and not a precondition to Ms. Duran's admission, it is hard to fathom that Ms. Atencio would have signed the agreement with that idea that arbitration would be a detriment rather than a benefit to Ms. Duran.  Moreover, Ms. Duran received benefits from the Admission Agreement as a whole: she was a resident of Vida Encantada for seven months, during which time she received nursing care services. Accordingly, Ms. Duran was a third-party beneficiary of both the Admission Agreement and the Arbitration Agreement, and, as such, was bound by their terms.

B.     Ms. Duran's Estate

Defendant argues that she cannot be compelled to arbitrate her state claims against Plaintiffs because she did not sign the Arbitration Agreement, and because her capacity as the personal representative of Ms. Duran's wrongful death beneficiaries, and the accrual of Defendant's wrongful death claim, did not arise until after Ms. Duran's death, and thus her claims cannot be subject to the Arbitration Agreement, which terminated upon Ms. Duran's death.  Doc. 11 at 15-16.  Defendant's argument misapprehends the nature of a wrongful death claim.

Defendant brought her wrongful death claims against Plaintiffs under the New Mexico Wrongful Death Act ("the Act"), which provides in relevant part:

> Whenever the death of a person shall be caused by the wrongful act, neglect or default of another, . . . and the act, or neglect, or default, is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then, and in every such case, the person who, or the corporation which, would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured.

NMSA 1978, § 41-2-1.  The Act is "a survival statute [that] provides a cause of action for the benefit of the statutory beneficiaries to sue a tortfeasor for the damages, measured by the value of the decedent's life, *which the decedent [herself] would have been entitled to recover had death not ensued*."  *Romero v. Byers*, 872 P.2d 840, 846 (N.M. 1994) (citation omitted; emphasis added).  Thus, wrongful death claims are derivative of a decedent's rights, and a wrongful death beneficiary has no claim save those claims that the decedent herself would have had.  *See Maestas v. Overton*, 526 P.2d 203, 204 (N.M. Ct. App. 1974) ("A literal reading of [the Act] gives the personal representative a cause of action, only if the decedent would have had one absent death."), *rev'd on other grounds*, 531 P.2d 947 (N.M. 1975).

Under the Act, Defendant, as the representative of Ms. Duran's estate, has only those claims that Ms. Duran, had she lived, would have had.  As discussed above, Ms. Duran was bound by the Arbitration Agreement to submit her claims to arbitration.  Further, Ms. Duran specifically agreed to bind not only herself, but also her "successors, assigns, heirs, personal representatives, guardians or any other persons deriving their claims through or on behalf of [Ms. Duran]."  Doc. 4-1, Ex. B at 1.  Defendant, Ms. Duran's heir and personal representative of her estate, derives her claims through Ms. Duran.  According to the plain language of the

Arbitration Agreement, Defendant thus is equally bound to submit the claims of Ms. Duran's estate to arbitration.  *See Patton*, 2012 WL 112216, at *10.

Defendant's argument that her wrongful death claim is not subject to the Arbitration Agreement because it "arose only after Ms. Duran's death" confuses the issues of when a wrongful death action accrues for limitations purposes and the substance of a wrongful death claim.  In *Stang v. Hertz Corp.*, the New Mexico Court of Appeals specifically held that a statutory amendment providing that a wrongful death cause of action accrues upon the death of the injured person (rather than at the time of injury, as it previously had) did not "change the rule that the injured person's cause of action is handed on to the personal representative."  463 P.2d 45, 55 (N.M. Ct. App. 1969), *aff'd*, 467 P.2d 14 (N.M. 1970).  More specifically, the Court explained that the amendment "made no change in the damages the personal representative might recover."  *Id.*  In discussing the substance of those damages, the Court confirmed that the Act "'preserves' the right of action [] and transmits to the personal representative the cause of action which the injured person would have had if death had not ensued."  *Id.*

Accordingly, while Defendant, as the personal representative of Ms. Duran's estate, had no cause of action until Ms. Duran died, her wrongful death claim nonetheless is derivative of, and limited in scope to, the claims that Ms. Duran would have had if she had lived.  As discussed above, based on the terms of the Arbitration Agreement, Defendant is bound to submit those claims to arbitration.

C.    Plaintiff THI

Defendant argues that Plaintiff THI may not compel arbitration under the Arbitration Agreement because it was not a signatory to that agreement.  As discussed above, however, a non-signatory who is a third-party beneficiary of a contract may compel arbitration under the contract.  Here, the Arbitration Agreement provides that Ms. Duran waived her right to have her claims brought as a lawsuit in court before a judge or jury, to the extent those claims were brought against Vida Encantada "(including its parents, affiliates, and subsidiary companies, owners, officers, directors, medical directors, employees, successors, assigns, agents, attorney and insurers)."  Doc. 4-1, Ex. B at 2.  The plain language of the Arbitration Agreement thus demonstrates that the parties intended to convey the benefits of the Arbitration Agreement to the persons and entities listed in the parenthetical: Vida Encantada's "parents, affiliates, and subsidiary companies, owners, officers, directors, medical directors, employees, successors, assigns, agents, attorney and insurers."  *Id.*  The term "affiliate" means "[a] person, organization, or establishment associated with another as a subordinate, subsidiary, or member."  *Patton*, 2012 WL 112216, at * 12 (quoting The American Heritage Dictionary 29 (4th ed. 2006)).

It is undisputed that Vida Encantada is a limited liability company whose sole member is Plaintiff THI.  As a member of Vida Encantada, THI constitutes an "affiliate" of Vida Encantada, and therefore is within the class of entities against whom Ms. Duran's rights to bring a lawsuit were explicitly waived.  *Id.*  Plaintiff THI thus is an intended third-party beneficiary of the Arbitration Agreement, and on that basis, may enforce the terms of that agreement against Ms. Duran's estate.  *Id.*

D.      Plaintiffs FAS and FCC

Defendant similarly argues that Plaintiffs FAS and FCC may not compel arbitration

under the Arbitration Agreement because they were not signatories to that agreement.  Unlike

Plaintiff THI, there is no indication in the Arbitration Agreement that the parties intended FAS

or FCC to be a beneficiary of that agreement.  First, although Defendant's complaint in the State

Court Action alleges that FAS "engaged in the business of owning, operating, managing and/or

maintaining" Vida Encantada, the complaint also makes clear that FAS did so pursuant to a

contract with Vida Encantada.  Doc. 8-1, ¶¶ 10-11.   As a third party contractor, FAS does not fit

into the category of a "parent," or "owner," as listed in the Arbitration Agreement.  Further, FAS

is not an affiliate, or member, of Vida Encantada, whose sole member, as noted above, is THI.

Notably, the sole member of FAS, Fundamental Long-Term Care Holdings, LLC, is also the sole

member of THI Baltimore.  THI Baltimore is the sole member of THI, which, in turn, is the sole

member of Vida Encantada.  Doc. 1, ¶ 2.  The relationship between FAS and Vida Encantada

through this web of membership, however, is too attenuated and indirect to demonstrate that the

parties intended FAS to be an entity covered by the Arbitration Agreement.  *See Patton*, 2012

WL 112216, at * 13.  Accordingly, Plaintiff FAS has no rights as a third-party beneficiary to

enforce the terms of the Arbitration Agreement against Ms. Duran's estate.  *Id.*

The Court reaches the same conclusion as to Plaintiff FCC.  Defendant's complaint

alleges that FCC "engaged in the business of providing consulting services" to Vida Encantada.

12.  As an outside consultant, FCC is not a "parent" or "owner" of Vida Encantada.  Nor is FCC

an "affiliate," or member, of Vida Encantada.  The sole member of FCC is THI Baltimore,

which, as noted above, is also the sole member of THI.  In turn, THI is the sole member of Vida Encantada.  Doc. 1, ¶ 1.  The connection between FCC and Vida Encantada through THI Baltimore is too indirect and attenuated to establish the parties' intent to extend the benefits of the Arbitration Agreement to FCC.  *See Patton*, 2012 WL 112216, at * 13.  Like Plaintiff FAS, Plaintiff FCC thus has no rights as a third-party beneficiary to enforce the terms of the Arbitration Agreement against Ms. Duran's estate.  *Id.*

Plaintiffs nonetheless argue that FAS and FCC may compel arbitration based on the doctrine of equitable estoppel, which "precludes a party from asserting rights he otherwise would have had against another when his own conduct renders assertion of those rights contrary to equity."[3] *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, No. 11-1251, 2011 WL 5545420, *4 (10th Cir. Nov. 15, 2011) (citation omitted).  Under this doctrine, a party to an arbitration agreement may be estopped from asserting that the lack of [another's] signature on a written contract precludes enforcement of the contract's arbitration clause when [the party] has consistently maintained that other provisions of the same contract should be enforced to benefit him." *Id.* (citation omitted).  In other words, a signatory to an arbitration agreement "cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory." *Id.*  (citation omitted).

---

[3]New Mexico has not made a determination as to whether to recognize the doctrine of equitable estoppel in the arbitration context.  In *Murken v. Succor Energy, Inc.*, 117 P.3d 985, 987-89 (N.M. 2005), the New Mexico Supreme Court considered an argument that a signatory to an arbitration agreement was estopped from avoiding arbitration with a non-signatory, but held that even if New Mexico recognized the doctrine, its application would not be appropriate in the case before it.

In *Medtronic*, the Tenth Circuit noted that "[t]he circuits have not uniformly articulated the standards for application of estoppel, but their formulations have contained common elements." *Id.* The *Medtronic* defendants relied on the standards articulated by the Eleventh Circuit in *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942 (11th Cir. 1999). In this case, Plaintiffs rely on the standards articulated by the Fourth Circuit in *Am. Bankers Ins. Group, Inc. v. Long*, 453 F.3d 623 (4th Cir. 2006). In *Franklin* and *Long*, respectively, the Eleventh Circuit and the Fourth Circuit reached the same conclusion that estoppel will permit a non-signatory to compel arbitration in the following two circumstances: (1) when the signatory must rely on the terms of the agreement in asserting its claims against the non-signatory; and (2) where the signatory alleges "substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *Franklin*, 177 F.3d at 757; *Long*, 453 F.3d at 627, 627 n.3.

With regard to the first circumstance, the Tenth Circuit explained that "the contract must form the legal basis of [the plaintiff's] claims; it is not enough that the contract is factually significant to the plaintiff's claims or has a 'but-for' relationship with them." *Medtronic*, 2011 WL 5545420, at * 6 (citation omitted). Accordingly, "[t]he claims must be so intertwined with the agreement that it would be unfair to allow the signatory to rely on the agreement in formulating its claims but to disavow availability of the arbitration clause of that same agreement." *Id.* (citation omitted). With regard to the second circumstance, also citing to Eleventh Circuit precedent, the Tenth Circuit explained that "allegations of collusion between a signatory and a nonsignatory, alone, are not enough to estop a signatory from avoiding

-32-

arbitration with a nonsignatory." *Id.* (citation omitted).  Rather, the allegations of collusion

must "establish that the claims against the nonsignatory are intimately founded in and

intertwined with the obligations imposed by the contract containing the arbitration clause." *Id.*

(citation omitted).  "The linchpin for equitable estoppel is equity-fairness." *Id.* (citation

omitted).  Accordingly, "[t]he plaintiff's actual dependence on the underlying contract in making

out the claim against the nonsignatory defendant is therefore always the *sine qua non* of an

appropriate situation for applying equitable estoppel." *Id.* (citation omitted).

     Plaintiffs argue that both theories of estoppel apply here.  First, Plaintiffs argue that

Defendant's claims against FAS and FCC are based on the alleged breach of obligations and

duties of care "that spring from the Admission Contract, of which the Arbitration Agreement is a

part." Doc. 3 at 21.  This argument, however, establishes only that the Admission Agreement is

factually significant to Defendant's claims, and has a "but-for" relationship with them.  Plaintiffs

cannot establish, as they must, that the Admission Agreement forms the legal basis for

Defendant's claims.  The duties that Plaintiffs owed Ms. Duran "were created entirely by state

tort law." *Long*, 453 F.3d at 630.  These duties were not "dependent on the terms of the

[Admission] contract." *R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n, Inc.*, 384 F.3d

157, 162 (4th Cir. 2004).  It is true that the formation of the Admission Agreement meant that

Plaintiffs would provide nursing care services to Ms. Duran, thereby assuming the common law

duties New Mexico places on a health care facility. *Id.*  Plaintiffs' "assumption of these duties

benefitted [Ms. Duran], but the benefit flowed from [New Mexico] law, not from the [specific

terms] of the [Admission] contract." *Id.*; *see also MAG Portfolio Consult v. Merlin Biomed*

-33-

*Group*, 268 F.3d 58, 61 (2d Cir. 2001) (equitable estoppel does not apply when a benefit results from "the contractual relation of parties to an agreement . . . [and] not . . . from the agreement itself"); *Coots v. Wachovia Sec., Inc.*, 304 F. Supp. 2d 694, 699 (D. Md. 2003) (benefit is indirect if it "flows as a result of contract formation"). Accordingly, Defendant's claims are not so intertwined with the Admission Agreement that it would be unfair to allow Defendant to disavow availability of the Arbitration Agreement.

Next, Plaintiffs argue that Defendant's claims against FAS and FCC "are premised on her allegations of substantially interdependent and concerted misconduct by these Plaintiffs and Plaintiff Vida Encantada." Doc. 3 at 20. Defendant's complaint clearly alleges that all of the Plaintiffs were a "joint venture/enterprise" in the negligent operation and management of Vida Encantada. Doc. 8-1, ¶¶ 24-30. If allegations of joint misconduct were sufficient to estop Defendant from avoiding arbitration with FAS and FCC, the Court would agree that Plaintiffs have met their burden of showing that estoppel is appropriate here. The test, however, requires Plaintiffs to establish, in addition to allegations of collusion, that Defendant's claims against FAS and FCC are intimately founded in and intertwined with the obligations imposed by the Admission Agreement. This Plaintiffs cannot do. As discussed above, the obligations allegedly breached by Plaintiffs arose from state tort law, not the terms of the Admission Agreement itself. Defendant's claims against FAS and FCC thus do not actually depend on the Admission Agreement. Accordingly, this is not the appropriate situation for applying equitable estoppel.

For these reasons, neither FAS nor FCC may compel arbitration against Ms. Duran's estate. The Court thus will deny Plaintiffs' motion to compel arbitration as to FAS and FCC.

4.     <u>Waiver</u>

Defendant argues that Plaintiffs waived their right to compel arbitration by failing to

invoke the Arbitration Agreement until 12 months after the State Court Action was commenced,

and after participating in the State Court Action by "nominally" participating in the discovery

process and filing a motion for protective order.  Doc. 11 at 16-18.  Federal law governs the

inquiry into whether a party has waived its right to arbitration.  *Blanco v. Sterling Jewelers Inc.*,

No. 09-CV-1330, 2010 WL 466760, *4 (D. Colo. Feb. 9, 2010) (citing *Sovak v. Chugai Pharm.*

*Co.*, 280 F.3d 1266, 1270 (9th Cir. 2002); *S & H Contractors, Inc. v. A.J. Taft Coal Co., Inc.*,

906 F.2d 1507, 1514 (11th Cir. 1990); *Danny's Constr. Co., Inc. v. Birdair, Inc.*, 136 F. Supp. 2d

134, 142 (W.D.N.Y. 2000)).  The party asserting waiver "bears a heavy burden of proof."

*MidAmerica Fed. Sav. and Loan Ass'n v. Shearson/Am. Exp. Inc.*, 886 F.2d 1249, 1260 (10th

Cir. 1989).  In determining whether that burden has been met, the Court gives "substantial

weight to the strong federal policy encouraging the expeditious and inexpensive resolution of

disputes through arbitration." *Hill v. Ricoh Americas Corp.*, 603 F.3d 766, 775 (10th Cir. 2010).

There is "no set rule as to what constitutes a waiver or abandonment of the arbitration

agreement."  *Id.* at 772.  The Tenth Circuit, however, has instructed that a party should not be

permitted to demand arbitration where it has waived its right to arbitrate in the narrow sense of

waiver, *i.e.*, where there has been an "intentional relinquishment or abandonment of a known

right."  *Id.* at 773.  Further, "[a]n important consideration in assessing waiver is whether the

party now seeking arbitration is improperly manipulating the judicial process."  *Id.*  Evidence of

such manipulation includes "a delay in suggesting arbitration until substantial discovery has

been completed, . . . or until the eve of trial." *Id.* at 774.  Another important consideration is whether ordering arbitration would be inefficient, such as where there has already been substantial progress in the litigation, where trial is imminent, or where there has been a substantial use of discovery procedures. *Id.*  "The final consideration in the waiver analysis is prejudice to the party opposing arbitration." *Id.*

Under this standard, the Court finds that there was no waiver.  Although Plaintiffs did not demand arbitration until a year after the State Action was commenced, "that length of time in itself does not establish waiver." *Id.* at 775.  The critical question is what was happening in the State Court Action before Plaintiffs sought to compel arbitration of Defendant's claims. *Id.*  As the Court found in *Hill*, the answer is "very little." *Id.*  The case was dormant until Defendant filed an amended complaint in March 2011, and served it on Plaintiffs in April 2011, only three months before Plaintiffs petitioned this Court to compel arbitration.  Before that, Plaintiffs engaged in only limited litigation activities in the State Court Action.  Specifically, Plaintiffs THI, FAS and FCC joined in a motion to dismiss for failure to state a claim, but the motion has not been heard or decided.  Although the court scheduled a hearing for July 2011 to consider the motion to dismiss and jurisdictional motions filed by other defendants, the Court canceled the hearing to await this Court's determination of Plaintiffs' motion to compel arbitration.  Further, Plaintffs Vida Encantada and THI also joined in the filing of a motion for a protective order, which did not go to the merits of any claim or defense, but merely sought to protect as confidential certain information Defendant requested in discovery.  The Court has not heard or decided the motion.  Finally, Plaintiff Vida Encantada propounded two requests for admissions,

which Defendant answered.  The requests sought information relating to jurisdiction to support a

possible removal rather than the merits of the case.

Based on this "minimal litigation activity," granting Plaintiffs' motion "would lead to

minimal inefficiency (from duplication of effort in court and in arbitration) and would not result

in any improper manipulation of the judicial process by [Plaintiffs]."  *Id.* at 776.  Further, "there

is no evidence in the record that [Plaintiffs] intentionally and knowingly relinquished [their]

right to demand arbitration."  *Id.*  Finally, Defendant has failed to show any substantial prejudice

from Plaintiffs' delay in seeking arbitration.  *Id.* at 775.  Although arbitration proceedings could

have begun earlier if Plaintiffs had requested arbitration earlier, thus leading to a more timely

resolution of Defendant's claims, "one would expect (and [Defendant] has not suggested

otherwise) that the dispute would still have been resolved in arbitration before the date set for

trial (had [Defendant] not opposed arbitration)."  *Id.* at 776.  Nor has Defendant shown that she

was burdened by discovery significantly more than she would have been if the dispute had gone

to arbitration at the outset.  *Id.*  Accordingly, the circumstances of this case, particularly in light

of the federal policy favoring arbitration, convince this Court that Plaintiffs have not waived

their right to compel arbitration.  *Id.*

III.    Motion to Stay and/or Dismiss Proceedings

Plaintiffs move to stay the instant proceeding.  Doc. 3 at 26.  Neither Section 3 nor

Section 4 of the FAA requires the Court to stay this case when the only issue before it is whether

to compel arbitration, and that issue has been resolved, as discussed above.  *Patton*, 2012 WL

112216, at * 24; *Am. Heritage Life Ins. Co. v. Beasley*, 37 F. App'x 712 (5th Cir. 2002) ("Here,

the only issue before the district court was whether to compel arbitration.  When it did so, there was nothing more for it to do but execute judgment.").  Accordingly, the Court will dismiss rather than stay this case.

Plaintiffs also move to stay the State Court Action pending arbitration, under Section 3 of the FAA, the All Writs Act, and the Anti-Injunction Act.  Doc. 3 at 26.  Section 3 of the FAA provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall upon application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.  This provision applies only when the Court has the underlying substantive suit before it.  *Patton*, 2012 WL 11216, at * 23.  Here, Defendant brought her substantive claims against Plaintiffs in state court, while Plaintiffs moved to compel Defendant to arbitrate those claims in federal court.  Section 3 of the FAA thus does not apply to this situation.

Plaintiffs also rely on the All Writs Act, which provides that a federal court "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. § 1651.  The relief of the All Writs Act, however, is subject to the limitations set forth in the Anti-Injunction Act, which provides:  "A court of the United States may not grant an injunction to stay proceedings in a State Court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."  28 U.S.C. § 2283.  "Any doubts as to the propriety of a

federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy." *Atl. Coast Line R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 297 (1970).

The Court is not persuaded that the FAA authorizes or requires an injunction to stay the State Court Action. Because Section 3 provides only that "the court in which such suit is pending" must stay proceedings if arbitration is required," it is "not the express, unambiguous grant of authority by Congress for a federal court to stay state court proceedings." *Patton*, 2012 WL 112216, at * 24. Nor is the Court persuaded that a stay of the State Court Action is necessary to aid its jurisdiction or to protect or effectuate its judgments. The Court expects the parties to comply with this Order compelling Defendant to arbitrate her claims in the State Court Action against Vida Encantada and THI. In the event of noncompliance, a judgment enforcement action to compel compliance is available to the aggrieved party. "This Court therefore has the tools at its disposal to protect and effectuate its judgment and to aid in its jurisdiction without resorting to an injunction against the state court." *Id.* Moreover, the State Court is equally bound to follow the FAA, "and there is no reason to believe the State Court will force Defendant to proceed with her claims against [Vida Encantada and THI] in contravention of the FAA and this Order." *Id.* This is especially true given that the State Court has already postponed hearing and deciding the motions before it, pending this Court's decision in the instant matter. The Court thus denies Plaintiffs' request for an order staying the State Court Action. *Id.*

**CONCLUSION**

Plaintiffs have satisfied their burden of establishing an agreement to arbitrate that binds Defendant and Plaintiffs Vida Encantada and THI.  The Court does not conclude that the unavailability of the NAF is integral to the Arbitration Agreement, that the Arbitration Agreement is procedurally unconscionable, or that Plaintiffs waived their right to compel arbitration.  Further, it is undisputed that all of Defendant's claims in the State Court Action fall within the scope of arbitrable claims within the Arbitration Agreement, and that the transaction involves interstate commerce.  Under Section 4 of the FAA, the Court thus compels Defendant to arbitrate her state claims against Plaintiffs Vida Encantada and THI.  Plaintiffs FCC and FAS have not met their burden of demonstrating that they may compel arbitration under the Arbitration Agreement, and thus, the Court will not compel Defendant to arbitrate her state claims against Plaintiffs FCC and FAS.  Because the Court has resolved the only issue before it in this matter, the Court dismisses this case.  Because it lacks authority to do so, the Court declines to stay the State Court Action.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction [Doc. 9] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Compel Arbitration [Doc. 2] is **GRANTED** in part and **DENIED** in part, as follows: (1) Plaintiffs' request to compel arbitration is **GRANTED** as to Defendant's claims asserted in the State Court Action against Plaintiffs THI of New Mexico at Vida Encantada, LLC, and THI of New Mexico, LLC, but is **DENIED** as to Defendant's claims asserted against Plaintiffs Fundamental Administrative Services, LLC, and

Fundamental Clinical Consulting, LLC; (2) this Court **ORDERS** Defendant to arbitrate the

claims asserted in the State Court Action against Plaintiffs THI of New Mexico at Vida

Encantada, LLC, and THI of New Mexico, LLC, in accordance with the terms of the Arbitration

Agreement; (3) Plaintiffs' request for an order to stay the State Court Action is **DENIED**; (4)

Plaintiffs' request to stay this proceeding is **DENIED**; and (5) this case is therefore

**DISMISSED**.


DATED this 22nd day of March, 2012.

_____
MARTHA VÁZQUEZ
United States District Court Judge